UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DENNIS L. HALL,

             Plaintiff,

-vs-                             Case No.  6:12-cv-330-Orl-28KRS

HEWLETT-PACKARD COMPANY and
SEDGWICK CLAIM MANAGEMENT
SERVICES, INC.,

             Defendants.

---

## ORDER

     In this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., Plaintiff alleges that Defendants erroneously denied his claim for long-term disability benefits.  Defendants, however, maintain that the denial of benefits was neither incorrect nor arbitrary and capricious.

     This case is currently before the Court on the parties' cross-motions for summary judgment, which they agree are dispositive.[1]  Having considered the parties' arguments, the record, and pertinent law, the Court concludes that Defendants' motion must be denied and that Plaintiff's motion must be granted in part and denied in part.

---

     [1]The pertinent filings are:  Defendants' Motion for Summary Judgment (Doc. 39); Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment (Doc. 44); Defendant's Reply (Doc. 46); Plaintiff's Motion for Summary Judgment (Doc. 40); Defendants' Opposition to Plaintiff's Motion for Summary Judgment (Doc. 43); and Plaintiff's Reply (Doc. 45).

I. Background

Plaintiff began employment with Defendant Hewlett-Packard Company on November 12, 1979.  The last position Plaintiff held was "field technical support representative IV," and his last day worked was March 23, 2011.  As a Hewlett-Packard employee, Plaintiff participated in the Hewlett-Packard Company Disability Plan ("the Plan"), which provided benefits for both short-term disability ("STD") and long-term disability ("LTD").  The Plan is funded by employee contributions and by Hewlett-Packard's general assets.  (A.R. 000017).[2]  Since January 1, 2008, Defendant Sedgwick Claim Management Services, Inc. has been the claims administrator under the Plan, and as such it is vested with discretion in determining eligibility for benefits and in reviewing denied claims.  (A.R. 000039; A.R. 000102).

The Plan provides for the payment of semi-monthly benefits to Plan participants who become "Totally Disabled."  (A.R. 000019).  The Plan's definition of "Totally Disabled" differs depending on the time period involved:

> "Totally Disabled" . . . means that because of injury or sickness:
>
> (i)     During the first twenty-six (26) weeks following the onset of the injury or sickness, the Participant is unable to perform the material and essential functions of his Usual Occupation at the Participating Company.
>
> (ii)    After the initial twenty-six (26) week period and prior to the end of the initial twenty-four (24) month period

---

[2]Citations to the administrative record, which have been filed with the Court in paper format, (see Doc. 38), are denoted by "A.R." followed by the page number. The parties have also submitted two deposition transcripts, (see id.), but those depositions are not part of the administrative record and therefore the Court has not considered them.

following the onset of the injury or sickness, the Participant is unable to perform the material and essential duties of his Own Occupation.

(iii)     Following the initial twenty-four (24) month period after onset of the injury or sickness, the Participant is continuously unable to perform any occupation for which he is or may become qualified by reason of his education, training or experience.

(A.R. 00009).  Thus, three "occupation" standards are described in these provisions—a "Usual Occupation at the Participating Company" standard, which applies to the initial 26-week period of what is typically referred to as "short-term disability," though it is not expressly referred to as such in the Plan; an "Own Occupation" standard that applies during the next eighteen months; and an "any occupation" standard that applies thereafter. "Usual Occupation" is defined in the Plan as "the customary work assigned to the Participant by the Participating Company which employs the Participant and performed on the Participant's customary schedule." (A.R. 000012).  "Own Occupation" is defined as "the type of work in which the Participant was engaged prior to the onset of his Total Disability and is not limited to the Participant's Usual Occupation or to jobs that provide any particular earnings level." (A.R. 000008).  "Any occupation" is not defined in the Plan; that term is not at issue in this case.[3]

_____

[3]The "any occupation" standard is not at issue here because Plaintiff's claim never proceeded beyond the initial 24-month period.  Moreover, under the Plan, conditions diagnosed as or equivalent to attention deficit disorder, chronic fatigue syndrome, Epstein-Barr Virus, infectious mononucleosis, and fibromyalgia are disregarded in the determination of "Total Disability" beyond the initial 24-month period. (See A.R. 000010).  In other words, benefits are not payable beyond 24 months for such conditions. (See Pl.'s Resp. Mem., Doc. 44, at 7 n.3 (acknowledging that "the Plan does provide that participants disabled by chronic fatigue syndrome or fibromyalgia are limited to 24 months of LTD benefits")).

The Plan further provides that "[t]he determination of Total Disability shall be made by the Claims Administrator on the basis of objective medical evidence." (A.R. 000010). "Objective medical evidence" ("OME") is defined as "that evidence establishing facts or conditions as perceived without distortion by personal feelings, prejudices or interpretations." (A.R. 000010).

On March 24, 2011, Plaintiff began a period of disability leave and applied for disability benefits under the Plan, providing to Sedgwick a list of twenty-six doctors he had seen and a list of symptoms including muscle pain in legs, upper back, and arms; inability to walk more than very short distances; inability to stand for more than a very short time; tendon pain; and "frequent leg jerking and occasional full body jerking." (A.R. 000445-000446).  Plaintiff also stated that he had undergone two muscle biopsies, multiple CT scans, and multiple MRIs, all of which showed "no abnormalities," and that the twenty-six doctors he had listed had performed "countless" tests.  (A.R. 000446).

On March 28, 2011, Dr. Samuel Shay, a family practice physician who was Plaintiff's primary doctor, completed Sedgwick's "Physician's Certification for Disability Benefits" form. (A.R. 000457). Dr. Shay provided a primary diagnosis description of "'Amalgam/Mercury Illness,' Chronic Myalgia, Leg Weakness, Fatigue" and described physical exam findings/symptoms, diagnostic tests, and results as: "Chronic Muscle Aches, Muscles-Leg Weakness, Chronic Fatigue, Difficulty Standing/Walking. Some muscle atrophy. Extensive testing has been inconclusive/nondiagnostic." (A.R. 000457). Dr. Shay listed Plaintiff's physical limitations as "unable to stand/walk, chronic pain" and stated that his chronic pain and muscle aches and weakness limited his ability to do his job. (A.R. 000457). Dr. Shay

-4-

indicated that Plaintiff was using a wheelchair and that his disability end date was "uncertain." (A.R. 000457).  By letter dated April 7, 2011, Sedgwick informed Plaintiff that his STD claim had been approved through April 16, 2011, and that medical documentation had been requested from Dr. Shay so that Sedgwick could assess Plaintiff's continued eligibility for benefits.  (A.R. 000448).

On April 21, 2011, Nathaniel Marshall, who held the title of Field Delivery Manager at Hewlett-Packard, completed a job description form that Sedgwick provided him regarding Plaintiff's "field technical support representative IV" position.  (A.R. 000449-000452). Marshall described the duties of the eight-hours-a-day job as: "Perform installations, maintenance, and/or repairs on customer equipment working primarily on site.  Install hardware, systems, devices, peripherals, basic operating systems and software applications. Configure system hardware, software, and network components." (A.R. 000449).  Tools and machines used in the job were listed as "laptop, hand tools (computer repair), occasional lift for installs, and electronic troubleshooting equipment."  (A.R. 000449).  Marshall described the job as requiring written and verbal communication "frequently"; reasoning, math and language "occasionally"; and making independent judgments "continuously." (A.R. 000449).  Marshall indicated that the position required the following physical activities: lifting or carrying less than 10 pounds 3-4 hours daily; lifting or carrying 10-20 pounds 1-2 hours daily; lifting or carrying 20-50 pounds less than 1 hour daily[4]; lifting or carrying more than 50

---

[4]The Sedgwick "Job Description" form that Marshall completed does not provide an option for checking "not at all" as to the duration an activity is performed.  The only options are:  less than one hour; 1-2 hours; 3-4 hours; 5-6 hours; and 7-8 hours.  Thus, "less than one hour" could mean anywhere from "not at all" to 59 minutes.

pounds less than 1 hour daily; reaching above shoulder height 3-4 hours daily; reaching at or below shoulder height 3-4 hours daily; computer keyboarding 5-6 hours daily; computer mouse use 5-6 hours daily; grasping and fine manipulation 5-6 hours daily; bending, kneeling, sitting, standing, and walking each 1-2 hours daily; and squatting and climbing each less than one hour daily.  (A.R. 000449-000451).  Marshall also indicated that in a usual workday, the job required sitting, standing, and walking each a maximum of one hour at one time without a break and that the job required driving and working around equipment and machinery.  (A.R. 000451).

On April 22, 2011, Dr. Shay completed Sedgwick's "Fibromyalgia Residual Functional Capacity Evaluation" form.  (A.R. 000464-000467).  Asked to check boxes on that form for physical symptoms applicable to Plaintiff, Dr. Shay checked:  multiple tender points, non-restorative sleep, chronic fatigue, morning stiffness, muscle weakness, subjective swelling, carpal tunnel syndrome, vestibular dysfunction, chronic fatigue syndrome, numbness and tingling, sicca symptoms, and depression.  (A.R. 000464).  Dr. Shay also indicated that Plaintiff's experience of pain is "constantly" severe enough to interfere with attention and concentration and that Plaintiff's condition renders him incapable of tolerating even low stress jobs.  (A.R. 000464).  When asked to describe the nature, frequency, and severity of Plaintiff's pain, Dr. Shay responded that Plaintiff had constant aching, weakness, and soreness "up to 10" on a severity scale of 1 to 10.  (A.R. 000465).  Dr. Shay noted the factors that precipitate pain as fatigue, movement/overuse, static position, and stress.  (A.R. 000465).  Dr. Shay answered "yes" to the question whether Plaintiff had any functional impairments that would place limitations on his performance in his usual and customary

work situation, identifying Plaintiff's inability to walk, stand, or prolongedly sit as limiting impairments.  (A.R. 000465).  Dr. Shay also indicated that Plaintiff could walk for zero minutes without rest or severe pain; that he was unable to lift; that he meets the American College of Rheumatology criteria for fibromyalgia; that he had a co-morbidity of amalgam/mercury poisoning; that in Dr. Shay's opinion Plaintiff is not a malingerer; and that Plaintiff's prognosis was poor, with "no work return date." (A.R. 000465, 000467).  Dr. Shay answered "yes" to the question whether Plaintiff's impairments could be expected to last 12 months.  (A.R. 000467).

On May 3, 2011, Dr. Shay completed Sedgwick's "Physician's Extension for Disability Benefits" form.  (A.R. 000471).  On this form, Dr. Shay listed a primary diagnosis of amalgam illness and a secondary diagnosis of fibromyalgia. (A.R. 000471). Dr. Shay noted symptoms of sensory loss; weakness and atrophy of both legs; aches and weakness in arms and legs; and fatigue. (A.R. 000471). Dr. Shay indicated that Plaintiff was using a cane, and Dr. Shay provided a disability end date of "possibly 2013." (A.R. 000471).  Dr. Shay described Plaintiff's limitations as "unable to work" due to difficulty walking/standing, chronic fatigue, and low endurance.  (A.R. 000471).

Based largely if not entirely on medical records received from Dr. Shay,[5] Sedgwick

---

[5] Sedgwick also received some medical records from Dr. Kirti Kalidas, who is board certified in internal medicine and naturopathic medicine.  (A.R. 000501-000504, 000606). Notes of an office visit with Dr. Kalidas on May 4, 2011 indicate diagnoses of fibromyalgia, hyperlipidemia, and hormone imbalance.  (A.R. 000606).  Additionally, Sedgwick received records dated 2005 and 2007 from Dr. William Triggs, a neurologist at Shands Hospital. (A.R. 000489-000500).  Several other doctors whose names Plaintiff provided to Sedgwick responded to Sedgwick's records requests by stating that they had not seen Plaintiff as a patient in several years and that consequently records were not available.  (See A.R.

approved Plaintiff's claim for STD benefits for the full 26-week STD period—through September 22, 2011—under the Plan's "Usual Occupation" standard.  (See A.R. 000386-000387).  Sedgwick's Case Notes regarding Plaintiff's STD claim reflect a file assessment by a registered nurse on May 23, 2011 with the recommendation that "there is OME to support max STD but not to . . . 2013."  (A.R. 000386); (see also A.R. 000385, fourth entry for May 20, 2011 (approving benefits "[b]ased on the FCE that indicates [Plaintiff] can't do any lifting and his job description that requires lifting up to 20 lbs"); A.R. 000386, entry for July 5, 2011 ("claim approved to max based on OME"); A.R. 000386, entries for July 8 and 31, 2011 ("No further action required on STD as claim is approved to the max duration based on objective medical.")).

Sedgwick then began to analyze Plaintiff's claim as a claim for LTD benefits.  (See A.R. 000511-000521 (Sedgwick's Case Notes Summary Report for LTD claim)).   On September 19, 2011, Sedgwick informed Plaintiff that his LTD benefit claim would remain pending effective September 22, 2011, as Sedgwick awaited receipt and review of more medical records from Dr. Shay.  (A.R. 000534).

Sedgwick's case notes regarding Plaintiff's LTD claim indicate that on September 27, 2011, a Sedgwick registered nurse assessed the claim, indicating that "[t]he medical documentation [received] was scant" and that "[t]he most recent [medical records] from Dr.

_____

000484 (Dr. Hyer, last saw Plaintiff in 2005); A.R. 000505 (Dr. Giles, last saw Plaintiff in 2008); A.R. 000507 (Mayo Clinic, no records for dates requested)).  In addition to the Dr. Shay records mentioned in the text, Dr. Shay's notes regarding a July 21, 2011 office visit state that Plaintiff had reported that his sore back had improved a little, (A.R. 000598), and notes regarding an August 24, 2011 office visit indicate that Plaintiff's nighttime calf pains were slowly improving and that body jerks had improved, (A.R. 000596).

Kalidas and Dr. Shay do not clearly indicate what is actually causing [Plaintiff's] disability." (A.R. 000513). The nurse suggested a functional capacity evaluation ("FCE") for an "in-depth assessment of physical capacity and etiology." (A.R. 000513).

On October 7, 2011, Sedgwick informed Plaintiff that additional medical documentation was necessary and that arrangements had been made for an examination at a physical therapy office on October 20, 2011. (A.R. 000538). This examination was to be a four-hour FCE with an FCE specialist. (A.R. 000541). The FCE specialist's office called Plaintiff on October 18—two days before the scheduled exam—to review "heart questions," and Plaintiff stated that he did not do any standing or walking, could not use his upper or lower extremities, and spent all day in a chair or bed. (A.R. 000515, first entry for October 18, 2011). The FCE specialist's office then asked Sedgwick whether it should proceed to conduct the FCE because it appeared that Plaintiff would "probably self limit himself." (A.R. 000515, first entry for October 18, 2011). The FCE was then cancelled, and according to Sedgwick's "Case Notes Summary Report," when Plaintiff was told of this that same day he said that "he didn't think he [could] do it anyway, as he cannot last the 4 [hours] that is required." (A.R. 000515, fourth entry for October 18, 2011). Plaintiff's case was then set up for a file review instead of an FCE, (A.R. 000516, first entry for October 21, 2011), and accordingly Sedgwick told Plaintiff that it would send a questionnaire to Dr. Shay and then forward the matter for an independent physician file review, (A.R. 000515, fourth entry for October 18, 2011).

Also on October 18, 2011, Dr. Shay completed Sedgwick's "Physician's Status Questionnaire." (A.R. 000614). Dr. Shay indicated that Plaintiff was unable to engage in

prolonged standing, walking, or stair climbing and that testing had been nondiagnostic. (A.R. 000614). Dr. Shay indicated "N/A" for both part-time and full-time return-to-work dates. (A.R. 000614). On October 27, 2011, Sedgwick informed Plaintiff that additional medical documentation was necessary regarding his LTD claim and that Sedgwick had made arrangements for Plaintiff's medical records to be reviewed by an independent physician. (A.R. 000542).

Sedgwick sent Plaintiff's records to Elite Physicians, Ltd., where they were reviewed by Dr. Howard Grattan, who is board certified in physical medicine and rehabilitation. In a report dated November 2, 2011, Dr. Grattan indicated that he spoke with Dr. Shay on October 31, 2011 and that Dr. Shay "reported that [Plaintiff] did not have a specific neurodegenerative diagnosis but had been to multiple specialists in search of the reason that [he] has the symptoms of pain and weakness." (A.R. 000617). Dr. Shay also reported that Plaintiff had "noticeable muscular atrophy of the bilateral lower extremities and 4/5 strength throughout the lower extremities." (A.R. 000617). Dr. Grattan reported that the primary diagnosis of Plaintiff was "myalgia not otherwise specified" and that "[t]here is a paucity of actual objective findings." (A.R. 000617-000618). Dr. Grattan stated: "There are no significant objective impairments, based on the medical information provided to me. It is reasonable that the patient's pain symptoms and possible muscle tissue loss of the lower extremities is due to deconditioning or a yet to be diagnosed myopathic process that would mildly impair the patient's ability to lift heavy objects floor to waist, climb ladders, work at heights and walk greater than a mile at any one time." (A.R. 000618). Based on the overall atrophy of Plaintiff's lower extremities, Dr. Grattan would impose restrictions of "lifting no

more than 50 pounds floor to wa[ist], walking less than 1 mile at any one time, avoidance of working at heights or climbing [ladders]." (A.R. 000618). Dr. Grattan concluded that based on the medical information he had been provided, Plaintiff "is mildly limited in his ability to complete a heavy-duty occupation" and that "[t]here is no neurologic testing or examination findings that suggest an ongoing or progressive condition at this time." (A.R. 000618).

On November 22, 2011, Sedgwick sent Plaintiff a letter denying his LTD benefit claim effective September 22, 2011. (A.R. 000543-000546). In that letter, Sedgwick explained that Plaintiff's medical records had been reviewed by Dr. Grattan, and the letter recounted Dr. Grattan's report, including his conversation with Dr. Shay. (A.R. 000544). The denial letter informed Plaintiff: "Per your job description provided by your employer, these restrictions would not prevent you from performing the essential functions of your occupation of Field Technical Support Rep IV. Your occupation does not require heavy lifting or extended walking or climbing." (A.R. 000544). In conclusion, the letter stated that the medical documentation in the file did "not provide the objective medical evidence necessary to support that [Plaintiff] meet[s] the Plan's definition of total disability." (A.R. 000545). Plaintiff was advised that in order to perfect the claim, he would "need to submit objective medical evidence that supports that [he] ha[s] a condition that prevents [him] from performing the essential duties of [his] occupation as defined by the Plan." (A.R. 000545).

Plaintiff was advised of his right to administratively appeal the claim denial, (A.R. 000545), and on December 6, 2011, Plaintiff—at that time acting on his own rather than through an attorney—submitted a letter requesting an appeal, along with ten attachments.

(A.R. 000549-000566).  One of the attachments was a December 6, 2011 letter from Dr.

Shay in which Dr. Shay stated in part:

> For the past several years, [Plaintiff] has had increasing
> weakness and pain initially in his legs which also began
> involving his back and his arms as well.  He also had . . . chronic
> fatigue and chronic aches pretty much all over his body which
> limited his activities more and more.  [Plaintiff] was evaluated by
> our office with multiple lab studies and radiologic evaluation.  He
> was also sent to multiple specialists including two or three
> neurologists, infectious disease and even physiatry and pain
> clinic.  We also sent him to a tertiary care center, Shands
> Hospital, to evaluate his condition and to attempt to determine
> a diagnosis.  Unfortunately, his condition is rather perplexing
> and his condition has not been completely confirmed.  At this
> time, we do feel he probably has chronic fatigue syndrome and
> an atypical presentation of fibromyalgia.  This has left him with
> significant pain in his legs and back and muscle atrophy of his
> calf muscles, his thigh muscles along with his biceps and
> triceps.  In addition, he has had difficulty with walking and
> standing and is unable to walk or stand for any extended period
> of time or to walk any distance longer than 20-30 feet at a time.
> [Plaintiff] has even followed up with the possibility of mercury
> poisoning and undergone chelation therapy without much
> improvement thus far.
>
> At this time, we do feel [Plaintiff] should be considered for total
> disability.  We do not feel he is able to maintain his job
> responsibilities and do not feel he can keep up with the
> requirements of any extensive or prolonged walking, stair
> climbing, any significant stooping or heavy lifting.  In addition,
> because of his back issues, any prolonged sitting also is a
> problem and must be limited.
>
> We are currently in the process of arranging for an electric
> scooter for [Plaintiff] to try to increase his mobility and we are
> also having him undergo a neuropsych testing to more formally
> evaluate and document his limitations.

(A.R. 000550).  Also attached to Plaintiff's appeal letter was a December 1, 2011 letter from

Dr. Kirti Kalidas that stated in part:

. . . I've known [Plaintiff] since 2007. He's had a background history of severe myalgias, chronic fatigue and loss of muscle mass and atrophy. He has seen multiple physicians in the past. The etiology of the muscle mass has not been determined, despite visits with these physicians.

Over the last year, his condition has worsened. Unfortunately, it has reached a point where even ambulating for 10 to 20 feet becomes extremely difficult. His chronic fatigue symptoms and weakness continue to be an issue.

On his physical examination today he has significant muscle loss of the biceps, triceps, and hyperreflexia of the biceps/triceps tendon area. His grip strength is normal. The thenar and hypothenar muscles are normal. His lower extremity shows severe atrophy of the calf muscles, and he has significant hyperreflexia. He has difficulty getting up out of his chair and ambulating the short distance from the examination room and into my office.

[Plaintiff] has also given me the requirement needs [sic] for his work, which include extensive walking, sitting, stooping and climbing stairs as well as ladders, as well as being required to stand for long periods. All of these requirements are absolutely impossible for [Plaintiff].

In my opinion, [Plaintiff] is unable to complete any of the work requirements, and as of this point he should be continued on his Disability status, based on his current condition. Unfortunately, his condition continues to deteriorate, with severe muscle loss and weakness.

(A.R. 000551).

Plaintiff also attached an email from his manager at Hewlett-Packard, Nathaniel Marshall, describing the requirements of the Field Technical Support Representative position. (A.R. 000557). Marshall described the position as:

Applies specialist skills to provide proactive and reactive support to Mission Critical systems, network, ITIL processes, and/or storage. Additional responsibilities require advanced skills in

-13-

> troubleshooting and technical analysis.    The job requires
> extensive travel to customer locations throughout Central and
> East Florida.    The customer sites could require extensive
> walking (plant facilities), equipment racking, sitting (while
> performing analysis, lifting (equipment, parts and tools),
> stooping (equipment access or replacement), climbing (stairs,
> ladders) to facilitate equipment access and installation.

(A.R. 000557).  Marshall further stated that some data center environments "could require

standing for long periods of time."   (A.R. 000557).   Plaintiff also submitted his own

description of his job requirements, which included driving to worksites; sometimes very long

walks in downtown areas or in customer plants; standing and climbing; sitting at a monitor;

climbing stairs when there is no elevator at a site; and working on ladders at "many sites."

(A.R. 000552).[6]

On December 13, 2011, Plaintiff was informed by the Social Security Administration

that he had been awarded Social Security disability benefits beginning September 2011.

(A.R. 000570-000575).    On December 15, 2011, Sedgwick acknowledged receipt of

Plaintiff's administrative appeal and informed Plaintiff that he would be notified of the

decision as soon as possible. (A.R. 000579). On December 24, 2011, Plaintiff submitted

three more documents in support of his administrative appeal—his social security disability

award letter; notes from an office visit with Dr. Shay on December 6, 2011; and notes from

an office visit with Dr. Kalidas on November 29, 2011.    (A.R. 000621-000624).    The

November 29 notes from Dr. Kalidas indicate increase in fatigue and difficulty with

---

[6]The other attachments to Plaintiff's appeal letter were letters from Plaintiff's wife and
co-workers, a partial list of medications that Plaintiff was taking, and photographs. (A.R.
000558-000566).

-14-

ambulation. (A.R. 000624). The December 6 notes from Dr. Shay indicate that Plaintiff had chronic fatigue, difficulty walking more than 20 feet, and muscle weakness in the arms that limited lifting. (A.R. 000623). Dr. Shay also noted atrophy of the biceps and triceps and significant atrophy of both calves and thighs. (A.R. 000623).

In considering Plaintiff's administrative appeal, Sedgwick sent Plaintiff's file to Insurance Appeals, Ltd., where it was reviewed by Dr. Jose Perez, a board-certified internal medicine specialist. In a report dated January 19, 2012 (A.R. 000636-638), Dr. Perez indicated that he had reviewed records from Dr. Shay and Dr. Kalidas as well as Dr. Grattan's file review. (A.R. 000636). Dr. Perez spoke with Dr. Shay on January 16, 2012, and Dr. Shay indicated that Plaintiff "had some type of dystrophy" and had atrophy of the muscles in the calves and arms but did not have a specific diagnosis. (A.R. 000636). Dr. Shay told Dr. Perez that Plaintiff "was able to ambulate and needed to take rests." (A.R. 000636). Additionally, Dr. Perez spoke with Dr. Kalidas on January 17, 2012, and Dr. Kalidas indicated that Plaintiff had significant difficulty with ambulation. (A.R. 000637).

Dr. Perez noted in his report that Plaintiff "is a field technical support worker with a diagnosis of myalgia, fatigue, chronic pain," and based on his review of the medical information in the file Dr. Perez concluded that Plaintiff was not disabled from his regular unrestricted occupation as of September 22, 2011. (A.R. 000637). Dr. Perez stated that the information from Drs. Shay and Kalidas "indicates that the claimant has suffered atrophy, pain, fatigue attributed to mercury intoxication" but that "[t]here is no information in the file that supports this diagnosis" and "no objective information from the neurologist that supports localized neurologic findings." (A.R. 000637-000638). Dr. Perez concluded that from an

-15-

internal medicine perspective, the information provided "does not impact the claimant's ability to function in his regular unrestricted occupation." (A.R. 000638). Dr. Perez noted that "[s]trength testing on office visits and the degree of atrophy has not been documented" and that "[a] Functional Capacity Evaluation would be reasonable to better evaluate this claimant with a gamut of symptoms and a paucity of objective findings by multiple physicians." (A.R. 000638).

Although Dr. Perez had noted that it "would be reasonable" for an FCE to be conducted in order to better evaluate Plaintiff, Sedgwick did not order an FCE after receiving Dr. Perez's report. Instead, in a letter dated February 7, 2012 (A.R. 000584-00585), Sedgwick informed Plaintiff that after review, it had determined the he did not qualify for additional disability benefits under the Plan. Sedgwick noted medical documentation in the file and that the file had been reviewed by Dr. Perez.[7] The letter concluded that "the information provided does not impact your ability to function in your regular unrestricted occupation" and that "disability is not supported as of September 22, 2011 forward." (A.R. 000585). Plaintiff filed this suit on March 1, 2012, challenging the denial of his claim for LTD benefits, (Compl., Doc. 1), and the parties' dispositive cross-motions for summary judgment are now before the Court.

---

[7]In the appeal denial letter, Sedgwick stated in part: "Dr. Perez attempted to complete a teleconference with K.M. Kalidas, M.D. on January 16, 2012 and January 17, 2012. Although messages were left regarding the nature of the call, no return call was received. Consequently, the teleconference was unsuccessful." (A.R. 00585). However, this is contrary to Dr. Perez's report, in which Dr. Perez stated that he left a voice mail for Dr. Kalidas on January 16, that Dr. Kalidas returned the call on January 17, and that Dr. Kalidas told him that Plaintiff "had significant difficulty with ambulation." (A.R. 000636-000637).

## II. Discussion

### A. ERISA Review Standards

As other judges in this district have aptly noted, "'[i]n an ERISA benefit denial case [subject to deferential review], . . . in a very real sense, the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary.'" Crume v. Metro. Life Ins. Co., 417 F. Supp. 2d 1258, 1272 (M.D. Fla. 2006) (quoting Leahy v. Raytheon Co., 315 F.3d 11, 17-18 (1st Cir. 2002), and collecting cases) (all but first alteration in original). "Accordingly, '[w]here the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply.'" Id. (quoting Bendixen v. Standard Ins. Co., 185 F.3d 939, 942 (9th Cir. 1999)) (alteration in original); see also Gammell v. Prudential Ins. Co. of Am., 600 F. Supp. 2d 227, 237 (D. Mass. 2008) ("Although summary judgment is ordinarily a procedural tool for screening out cases that do not present trialworthy issues, in ERISA actions it is 'simply a vehicle for deciding the issue.'" (quoting Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005))).

"ERISA itself provides no standard for courts reviewing the benefits decisions of plan administrators or fiduciaries." Blankenship v. Metro. Life Ins. Co., 644 F.3d 1350, 1354 (11th Cir. 2011). However, the Eleventh Circuit has "established a multi-step framework to guide courts in reviewing an ERISA plan administrator's benefits decisions." Id. The six

-17-

steps in this framework are:

>(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
>(2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
>(3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
>
>(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
>
>(5) If there is no conflict, then end the inquiry and affirm the decision.
>
>(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

Id. at 1355.

In the instant case, it is undisputed that Sedgwick both was vested with discretion in reviewing claims and was not acting under a conflict of interest. Thus, at most, five of the six steps set forth above need be applied here. The Court must first assess whether Sedgwick's decision to deny Plaintiff's claim for LTD benefits was "wrong" under the de novo standard—that is, whether the Court disagrees with that decision. If so, the Court must then examine whether reasonable grounds nevertheless support Sedgwick's decision such that it must be affirmed. See Glazer v. Reliance Standard Life Ins. Co., 524 F.3d 1241, 1246

(11th Cir. 2008) (quoting Jett v. Blue Cross & Blue Shield of Ala., 890 F.2d 1137, 1139 (11th Cir. 1989) (nothing that when the arbitrary and capricious standard is applied, "'the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made'").

B.  Application

Plaintiff argues for reversal of the decision to deny his claim for LTD benefits, and he requests an award of LTD benefits.  Upon consideration of the administrative record, the Court concludes that this matter must be remanded to Sedgwick for reassessment of Plaintiff's LTD claim.

"Where an administrator applies or uses an incorrect definition of an ERISA plan term the proper course is generally to remand the matter to the administrator."  Barlow v. Sun Life & Health Ins. Co., 488 F. App'x 458, 459 (11th Cir. 2012).  In Barlow, the court found "multiple instances of the plan administrator and the medical experts using an incorrect definition of 'regular occupation.'"  Id.  Like "Own Occupation" in the Plan at issue here, "regular occupation" in the Barlow plan "encompass[ed] more than just the specific duties that Ms. Barlow performed for her employer," yet the administrative record showed the administrator focused on Ms. Barlow's specific duties for her employer and not of her broader occupation.  Id.  Additionally, the Barlow court found that the record was "unclear as to what 'occupation' was applied to Ms. Barlow for purposes of determining whether she was able to perform the duties of that typical occupation."  Id.

Continuing, the Barlow court explained that "[t]o make matters even more confusing, the record is also unclear as to what, if any, job description or other vocational information

was used by" the administrator or the reviewing doctors. Id. The court concluded that "[b]ecause it is impossible to apply the arbitrary and capricious standard without knowing what [the administrator] believed Ms. Barlow's occupation was, and without knowing how [the administrator] defined 'regular occupation,' a remand is appropriate." Id. The Barlow court thus remanded to the district court with instructions to remand the matter to the administrator so that the administrator could "consider in the first instance whether Ms. Barlow is unable to perform all of the material and substantial duties of her 'regular occupation' as it is typically performed." Id. at 460.

The case at bar is similar to Barlow with regard to the administrator's assessment of the relevant occupation and the claimant's abilities to perform that occupation. The Plan provides a "Usual Occupation" standard during the first twenty-six weeks and an "Own Occupation" standard during the next eighteen months. However, the only evidence in the administrative record pertains to the duties of Plaintiff's "Usual Occupation"—the customary work assigned to Plaintiff when he worked for Hewlett-Packard as a "field technical support representative IV." In evaluating Plaintiff's LTD claim, Sedgwick and the physician reviews seemingly used that occupational definition instead of the "Own Occupation" definition of the Plan.[8] This was error and, as in Barlow, remand is required on this basis.

---

[8]Moreover, Sedgwick's characterization of the "field technical support representative IV" position varied during its administration of Plaintiff's claim for disability benefits. For example, during the STD phase, Sedgwick described Plaintiff's job as a "heavy occupation" that required lifting up to twenty pounds and that Plaintiff's inability to lift–based on Dr. Shay's April 2011 FCE—rendered him unable to do his job. (A.R. 000385, first and fourth entries for May 20, 2011). However, during the LTD assessment, Sedgwick noted that Plaintiff "works as field technical [support representative] IV and job demands are sedentary." (A.R. 000513, entry for September 27, 2001; A.R.000516, first entry for October

As in <u>Barlow</u>, it is not possible to assess Sedgwick's assessment of Plaintiff's capabilities without knowing what Sedgwick regarded as Plaintiff's "Own Occupation" or how Sedgwick defined that occupation.  Sedgwick argues in part that it "acted reasonably in assuming that any restrictions, such as climbing ladders or walking for long periods, were unique to Plaintiff's particular job, and not to all jobs in his occupation." (Doc. 43 at 12). However, such "assumptions" are not proper.   Additionally, in a footnote in its reply memorandum, Sedgwick cites the Dictionary of Occupational Titles ("DOT") as support for the assertion that Plaintiff's occupation is "sedentary." (Doc. 46 at 4).  Plaintiff aptly notes, however, that while Sedgwick could have looked at a broader description of Plaintiff's occupation or at a DOT definition of that occupation, it did not do so when assessing or reviewing Plaintiff's LTD claim. (Pl.'s Reply Mem., Doc. 45, at 2 & 4).

In the course of handling Plaintiff's disability claim, Sedgwick has also inconsistently characterized the quality of the medical evidence.  Sedgwick found OME to support maximum STD benefits, but when faced with essentially the same type of medical records on the LTD claim, it found a lack of supporting OME.  As noted by Plaintiff, there is only one definition of OME in the Plan, and it applies to both the six-month STD period and the LTD period thereafter.  Sedgwick also refers to OME differently—variously discussing, for example, OME of "total disability," OME of "a disability diagnosis," OME of "a medical reason," or OME of a "cause"—though in its reply memorandum it acknowledges that "the Plan does not explicitly require a diagnosis" before benefits may be awarded, (Doc. 46 at

_____

21, 2011).

2). On remand, Sedgwick shall apply the terms of the Plan consistently, including the term "objective medical evidence."

### III.  Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1.  Defendants' Motion for Summary Judgment (Doc. 39) is **DENIED**.

2.  Plaintiff's Motion for Summary Judgment (Doc. 40) is **GRANTED in part** and **DENIED in part**. The motion is granted insofar as it seeks to vacate the denial of Plaintiff's claim for LTD benefits but is denied insofar as it seeks an award of LTD benefits at this time.

3.  This case is **REMANDED** to Defendant Sedgwick Claim Management Services, Inc. for reconsideration of Plaintiff's claim for LTD benefits consistent with this Order.  On remand, Sedgwick shall determine what Plaintiff's "Own Occupation" is and what the "material and essential duties" of that "Own Occupation" are before then comparing those duties to Plaintiff's capabilities during the relevant time period.  Sedgwick shall also address the other concerns noted in this Order.

4.  This action is **STAYED** pending reconsideration by Sedgwick of Plaintiff's claim for LTD benefits as set forth in paragraph 3 above.  The parties shall file a joint status report no later than **Friday, July 19, 2013**, and every forty-five days thereafter.  If the parties reach a settlement of this matter, they shall advise the Court of such immediately.

**DONE** and **ORDERED** in Orlando, Florida this ___5___ day of June, 2013.

JOHN ANTOON II
Senior United States District Judge

-22-

Copies furnished to:
Counsel of Record